LABORATORIOS ROLDAN, C. POR A., a Dominican Republic Corporation, Plaintiff,

v.

TEX INTERNATIONAL, INC., a Florida Corporation, Backhome International Corporation, a Florida Corporation, Roldan Corporation, a New York Corporation, Zuri International Inc., a New York Corporation, Homeboy's Discount, Inc., a New York Corporation, A.B.C.E. Wholesale Inc., a Dissolved New York Corporation, Symcha Horowitz, a Resident of Florida, Eduardo Klinger, a Resident of Florida, Melina Klinger, a Resident of Florida, Raquel Aini, a Resident of New York, and Jacob Aini, a Resident of New York, Individually and d/b/a A.B.C.E. Wholesale Inc., Defendants.

No. 94–1838–CIV.

United States District Court, S.D. Florida, Miami Division.

Sept. 19, 1995.

---

Bernardo Burstein, Marlene K. Silverman, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Florida, for plaintiff.

Dean J. Rosenbach, Lewis, Vegosen and Rosenbach, P.A., West Palm Beach, Florida, for defendants.

## *ORDER*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Plaintiff's Motion for a Preliminary Injunction (DE # 89).

THE COURT has considered the Motion, responses, witness testimony, proffers of witness testimony and the pertinent portions of the record, and being otherwise fully advised in the premises, it enters the following Order.

## *FINDINGS OF FACT*

### I.  The Parties

#### A.  The Plaintiff

1.  Plaintiff Laboratorios Roldan, C. por A. ("Laboratorios Roldan" or "Plaintiff") is a company organized and existing under the laws of the Dominican Republic, and has its principal place of business located at Kilometro 5½, Carretera Sanchez, Santo Domingo, the Dominican Republic.  (5/1/95 Hr'g Tr., Vol. 1, at 42–43).

2.  Plaintiff has been at that location since 1967.  (*Id.* at 43).  Plaintiff employs approximately 100 persons (*Id.* at 34), and including its predecessors has been in business in the Dominican Republic since 1929.  (*Id.* at 41–

42). Plaintiff does not have any subsidiaries or affiliated companies, either in the Dominican Republic or abroad, including the United States. (*Id.* at 72–73).

3. Plaintiff manufactures and sells approximately 250 products, including soaps, cosmetics, cleaning detergents, and medications, which it makes for itself as well as for local and foreign companies. (*Id.* at 68–69).

## B. The Individual and Corporate Defendants

4. Individual defendants Symcha Horowitz ("Horowitz"), Eduardo Klinger ("E. Klinger"), and Melina Klinger ("M. Klinger"), who is E. Klinger's daughter, reside in the State of Florida. (*See* M. Klinger Dep., taken Mar. 1, 1995, at 4). As described in greater detail below, Horowitz, E. Klinger and M. Klinger are engaged in the cosmetics business, and their principal place of business is located at 7845 N.W. 148th Street, Miami Lakes, Florida.

5. Individual defendants Jacob Aini ("J. Aini") and Raquel Aini ("R. Aini") are married, and reside at 3111 Ocean Parkway, Apartment 3–B, Brooklyn, New York. (J. Aini Dep., taken Mar. 13, 1995, at 6). J. Aini and R. Aini are also business associates of one another. (*Id.* at 17–18). As described in greater detail below, J. Aini and R. Aini are engaged in the cosmetics business, and their principal place of business is located at 1805 Church Avenue, Brooklyn, New York.

6. Defendant Roldan Corporation ("Roldan") is a New York corporation with its principal place of business located at 1805 Church Avenue, Brooklyn, New York. This address is also the principal place of business for other companies owned and controlled by defendants J. Aini and R. Aini, including Defendants Zuri International, Inc., A.B.C.E. Wholesale Inc., and Homeboy's Discount, Inc. (*See* J. Aini Dep. at 53, 56–57, 74–75).

7. Horowitz owns fifty percent (50%) of Roldan and is the president of Roldan; R. Aini owns the remaining fifty percent (50%),

and is the vice president of Roldan. (*Id.* at 94–96). Roldan does not have any employees. (*Id.*)

8. Defendant Zuri International, Inc. ("Zuri") is a New York corporation with its principal place of business located at 1805 Church Avenue, Brooklyn, New York. (*Id.* at 56). Zuri is an import/export company. (*Id.* at 166). R. Aini owns Zuri, and is Zuri's president and only officer and salaried employee. (*Id.* at 58–62). J. Aini is not an employee or officer of Zuri, but acts as Zuri's "buyer," which is an "informal" position. (*Id.* at 58, 61).

9. A.B.C.E. Wholesale, Inc. ("A.B.C.E.") is a dissolved corporation with its principal place of business located at 1805 Church Avenue, Brooklyn, New York. (*Id.* at 34, 78). Like Zuri, A.B.C.E. was engaged in the import/export business. (*Id.* at 166). A.B.C.E. was dissolved in the spring of 1994. (*Id.* at 78). When A.B.C.E. was dissolved, Zuri took over its telephone number and its business. (*Id.* at 77–78, 166–67). R. Aini owned A.B.C.E. and was the president of A.B.C.E. (*Id.* at 74–75).

10. Homeboy's Discount, Inc. ("Homeboy's") is a New York corporation with its principal place of business located at 1805 Church Avenue, Brooklyn, New York. (*Id.* at 53, 76–77). R. Aini owns half of Homeboy's and is president of Homeboy's. (*Id.* at 49, 52). J. Aini, who owns the other half of Homeboy's, is the secretary of Homeboy's. (*Id.* at 49, 51). Homeboy's has no other officers. (*Id.* at 51).

11. At depositions, both R. Aini and Horowitz testified that they were entirely ignorant of and unknowledgeable about the various companies that they own and are officers of, including Roldan. (*See, e.g.,* R. Aini Dep., taken Mar. 15, 1995, at 12–15, 27–28, 126–27; Horowitz Dep., taken Mar. 24, 1995, at 21–22, 27–28, 33–35, 89–90).[1] The evidence in the record from other parties, however, including that of J. Aini, and nonparties, demonstrates that R. Aini actively participates in the Defendant corporations Backhome International Corporation, Rol-

---

1. For example, when asked whether she had heard of a company called Roldan, R. Aini answered, "[n]o. I heard of a company Roldan in some products but nothing specific, no. Where? Some products I heard but nothing specific. I heard the name." (R. Aini Dep. at 12).

dan, Zuri, A.B.C.E. and Homeboy's. (See, e.g., J. Aini Dep. at 52, 139–41; Duval Dep., taken Nov. 22, 1994, at 7; Rodriguez Dep., taken Nov. 17, 1994, at 8–12; Perez Dep., taken Nov. 18, 1994, at 21–22. See also 5/1/95 Hr'g Tr., Vol. 2, at 8–9). Moreover, in or about November of 1993, Roldan filed a trademark application in which R. Aini filed a signed declaration setting forth details about Roldan. (R. Aini Dep. Ex. 10, at 6–8).

12. Zuri, A.B.C.E., and Homeboy's are each engaged in the business of distributing various cosmetics and consumer goods, including Defendants' "Roldan" products, for the "ethnic market," which includes the African–American market, the Latino market, and the Caribbean market. (See 5/1/95 Order at 12–14 (denying various motions to dismiss on jurisdictional grounds); J. Aini Dep. at 156–58).

13. Zuri, A.B.C.E., and Homeboy's share the same corporate address, and the evidence strongly suggests that the companies are, in fact, alter egos of each other. (See 5/1/95 Order at 12–14 (denying various motions to dismiss on jurisdiction grounds); J. Aini Dep. at 53, 56–57, 74–75, 77–78).

14. Before the Distribution Agreement between Zuri and Tex International, Inc. (see ¶¶ 18–21 infra ), buyers typically would place their orders with R. Aini and would not know which company they had purchased from until they received the receipt or invoice with shipment of merchandise. (See, e.g., Duval Dep. at 7–13; Pl.Exs. 423–26). After the execution of the Distribution Agreement, when buyers in Florida called R. Aini to order product, they were referred to Tex International, Inc. (Duval Dep. at 12–13).

15. Defendant Tex International, Inc. ("Tex") is a Florida corporation with its principal place of business located at 7845 N.W. 148th Street, Miami Lakes, Florida. (E. Klinger Dep., taken Feb. 22, 1995, at 19–20). Tex describes itself as "Importers and Distributors of Fine Skin and Hair Products", (Id. Ex. 7) although at deposition, E. Klinger testified that Tex does not import products, but serves as a wholesaler and/or distributor to other wholesalers and to retailers. (Id. at 56).

16. Defendant Horowitz owns seventy-five percent (75%) of Tex, and is the president, a director, treasurer and secretary of Tex. (Id. at 10). Defendant E. Klinger is the vice president of Tex, and owns the remaining twenty-five percent (25%) of Tex. (Id. at 9–10). E. Klinger is also a director of Tex. (Id. at 107–08).

17. E. Klinger is the buyer for Tex, and is a salesman for Tex as well. (Id. at 8). Tex has approximately four (4) or five (5) other employees. (Id. at 15, 39).

18. On or about October 15, 1993, Zuri and Tex entered into an Exclusive Distribution Agreement (the "Agreement"). According to the Agreement, Tex is Zuri's agent in Florida, and is obligated to purchase $1.8 million of products from Zuri or from any other company which J. Aini or R. Aini owned or had an interest in. (Second Am. Compl.Ex. A). (See generally J. Aini Dep. at 151–55; E. Klinger Dep. at 61–65). J. Aini signed the Agreement on behalf of Zuri, with the knowledge and approval of R. Aini (the president of Zuri). (Jacob Aini Dep. at 321–22). Horowitz signed it on behalf of Tex.[2]

19. As part of the Agreement, J. Aini provided Tex with lists of clients and contacts. (E. Klinger Dep. at 152–53).

20. Tex sells its products in the South Florida market and in the Caribbean. (Id. at 129–30, 150; J. Aini Dep. at 153).

21. At least 50 percent (50%) of Tex's merchandise is purchased from the Ainis. (E. Klinger Dep. at 143–44).

22. Prior to Tex, J. Aini and R. Aini used Adolfo's House as its Florida agent. (See J. Aini Dep. at 162–64). The "general understanding" was that "the people that would come to [the Ainis] from Florida for mass sales would be [referred] to Adolfo House." (Id. at 164).

---

**2.** Prior to the Distribution Agreement, Horowitz and Tex were already customers of J. Aini and R. Aini; Horowitz had been to New York to buy "assorted products" from the Ainis. (J. Aini Dep. at 156–60; E. Klinger Dep. at 61). Horowitz bought approximately $150,000 worth of products from R. Aini. (Pl.'s Ex. 431; J. Aini Dep. at 159–60).

23. Defendant Backhome International Corporation ("Backhome") is a Florida corporation with its principal place of business located at 7845 N.W. 148th Street, Miami Lakes, Florida. (E. Klinger Dep. at 19–20). It is a "mail order business" (J. Aini Dep. at 225), and deals in the same products as Tex and Zuri, from which it purchases its inventory to sell to the public. (E.g., M. Klinger Dep. at 69–70). The shareholders of this company are Horowitz and R. Aini, each of whom owns fifty percent (50%) of Backhome. (J. Aini Dep. at 225). R. Aini is the president of Backhome; E. Klinger is the vice president; M. Klinger is the treasurer; and Horowitz is the secretary. (M. Klinger Dep. at 10).

24. M. Klinger, the daughter of E. Klinger, is responsible for the day-to-day operations of Backhome; however, M. Klinger operates this business with the business advice and consultation of R. Aini, J. Aini, Horowitz and E. Klinger. (E.g., Id. at 198–200; E. Klinger Dep. at 44–46).

## II. The Events

25. Plaintiff first registered the "Roldan" trademark in the Dominican Republic in 1959; and in 1964, Plaintiff registered "Laboratorios Roldan, C. por A." as a trade name in the Dominican Republic. (5/1/95 Hr'g Tr., Vol. 1, at 43–44, 66–67; Pl.Exs. 202, 204). Plaintiff has never abandoned its trademark in the Dominican Republic. (Id. at 62).

26. Of the 250 products that Plaintiff manufactures and sells, 200 products are made for its own account, and each of those products is sold in packaging that uses a trade dress that identifies Plaintiff as the manufacturer. (See Id. at 74).

27. Among the soaps that Plaintiff manufactures and sells is one that it sells under the brand name "Jabon Germicida Roldan," which translates from the Spanish to English as "Roldan Germicidal Soap." As indicated by the use of the word "germicida" or "ger-

micidal," the "Jabon Germicida Roldan" product is a germicidal or anti-microbial soap. (Roldan Decl., executed Dec. 16, 1994, ¶ 6).

28. Plaintiff makes the "Jabon Germicida Roldan" soap in two strengths: "2%" and "1%." The "Jabon Germicida Roldan 2%" soap is sold in a box that features the "Jabon Germicida Roldan" brand name and a design consisting of red and yellow lines. (See, e.g., Pl.Exs. 221 & 222). The "Jabon Germicida Roldan 1%" soap is sold in a box that employs a like design, except that it uses dark and light blue lines, instead of red and yellow lines. (See, e.g., Pl.Exs. 224 & 225). In the case of both trade dresses and packaging, the "Roldan" name is written fancifully in script, and in a style that Plaintiff has utilized for at least twenty-five (25) years. (5/1/95 Hr'g Tr., Vol. 1, at 65).

29. Both trade dresses identify on a side panel that the product is made in the Dominican Republic for "Laboratorios Roldan, C. por A.," which also is written in fanciful script. (See Pl.Exs. 221, 222, 224 & 225).

30. Plaintiff has manufactured and sold its "Jabon Germicida Roldan" product since 1960, and the product has had the same brand name during this period of time. (5/1/95 Hr'g Tr., Vol. 1, at 76).

31. Plaintiff has sold its "Jabon Germicida Roldan" product utilizing its current packaging and trade dress (see Pl.Exs. 221, 222, 224 & 225) continuously for over 20 years, since 1970 or 1971. (5/1/95 Hr'g Tr., Vol. 1, at 76).[3]

32. The trade dress that Plaintiff has used for its "Jabon Germicida Roldan" product, both 1% and 2%, since 1970 or 1971, is non-functional and inherently distinctive.

33. Plaintiff is both the manufacturer and wholesaler of its products. (Id. at 41).

34. Plaintiff's products, including its "Jabon Germicida Roldan" product, are sold in the Dominican Republic, and those products,

3. The Plaintiff has made two slight changes to the trade dress and packaging of its "Jabon Germicida Roldan" product over the years, as it made different versions of the product for sale to the United States. The only change to the packaging, however, has been in one listed ingredi-

ent. (See ¶ 36 infra). These minor changes did not affect the trade dress or presentation of the packaging, which has remained the same since 1970 or 1971. (See 5/1/95 Hearing Tr., Vol. 1, 77–80).

as well as others made by Plaintiff, are bought there (either directly from Plaintiff or from other wholesalers) by exporters located in the Dominican Republic as well as by persons from other countries (including the United States), who then export the products to other countries, including the Bahamas, Haiti, Turks and Caicos, and the United States. (*Id.* at 90–93).

35. Since 1990, Plaintiff has made a version of its "Jabon Germicida Roldan" soap for export to, and sale in, the United States. (*Id.* at 95). It is uncontradicted that, prior to this litigation, Plaintiff itself did not sell its product directly into the United States. (5/1/95 Hr'g Tr., Vol. 3, at 39).

36. In 1990, Plaintiff began to manufacture and sell a version of its "Jabon Germicida Roldan" with the chemical ingredient "hydroquinone," in place of the ingredient "mercury iodide." (5/1/95 Hr'g Tr., Vol. 1, at 79). In 1995, Plaintiff began to make a version of its "Jabon Germicida Roldan" soap with "trichlorocarbanilide," instead of "mercury iodide" or "hydroquinone." (*Id.* at 79, 89).

37. The 1% and 2% versions of Plaintiff's "Jabon Germicida Roldan" soap with hydroquinone or trichlorocarbanilide have never contained mercury iodide or mercury as an ingredient. (5/2/95 Hr'g Tr., Vol. 3, at 59–60; *see also* Proffered Test. José René Roldán Pl.'s Written Proffer of Rebuttal Witness Test. Supp.Mot.Prelim.Inj., filed July 11, 1995, at 12–13).[4]

38. Since 1988, which is at least five (5) years prior to the time that Defendants began to make and sell their "Roldan" products (*see* ¶¶ 55, 57, 59 *infra*), all three versions of Plaintiff's "Jabon Germicida Roldan" soap have been sold in the United States. (5/1/95 Hr'g Tr., Vol. 1, at 91–92). Various Defendants or entities, including J. Aini, R. Aini and Tex (*see* ¶¶ 43–45, 52 *infra*), have imported Plaintiff's products from the Dominican Republic for sale in the United States.

39. Although Plaintiff's "Jabon Germicida Roldan" soap (with the labelling ingredients liquid phenol and mercury iodide) is sold in the United States, it is not the version of the product that Plaintiff makes for the United States; the product "is brought in by people who export products" from the Dominican Republic and then import the product into the United States. (5/2/95 Hr'g Tr., Vol. 3, at 28–29, 37–38).

40. There is no evidence in the record of any "Jabon Germicida Roldan" soap manufactured by Plaintiff being refused admission into the United States by customs agents for any reason, including because the product contained mercury.[5]

41. From 1990 to the present, in addition to being sold in the Dominican Republic and in the Caribbean, Plaintiff's "Jabon Germicida Roldan" product, as well as other products, have been continuously sold in the United States. Plaintiff's "Jabon Germicida Roldan" product was readily available in the South Florida marketplace, and the "Roldan" trademark, the trade dress for the "Jabon Germicida Roldan" soap product and Plain-

---

**4.** Defendants' chemist, Kappa Laboratories, Inc., detected 1.5 parts per million (ppm) of mercury in Plaintiff's "Jabon Germicida Roldan 1%" soap (with the labelling ingredients liquid phenol and trichlorocarbanilide). (Defs.' Proffered Test. Dr. Peter J. Kmiek, filed June 9, 1995, at 4). This amount is .53 ppm more than the amount that Defendants maintain is permitted by the FDA. (*See* Defs.' Proffer Test. Lavar R. Lee, filed June 9, 1995, at 2–5). Plaintiff's expert asserts that this amount is minuscule and merely a trace amount, and not enough for one to infer that mercury is an ingredient of this product. (Proffered Test. Burch B. Stewart, Ph.D., Pl.'s Written Proffer of Rebuttal Witness Test. Supp.Mot.Prelim.Inj., filed July 11, 1995, at 14–15). According to Plaintiff's expert, this amount is not surprising because mercury is a ubiquitous element, and it can be found in products, notwithstanding the most careful and rigorous efforts by the manu-

facture to keep it out. (*Id.*). The Court accepts Plaintiff's expert's conclusion that Plaintiff has not intentionally included mercury as an ingredient in the soap containing trichlorocarbanilide.

**5.** The Federal Food, Drug and Cosmetic Act precludes the importation of any drug or cosmetic which is considered adulterated. 21 U.S.C. § 331 (1972). Section 700.13(d)(2) of Title 21 of the Code of Federal Regulations establishes that any cosmetic (other than an eye cosmetic) which contains greater than one (1) part per million of mercury is adulterated. 21 C.F.R. § 700.13(d)(2) (1995). Therefore, if Plaintiff's products contained more than one (1) part per million of mercury, they should have been denied entry into the United States by United States Customs agents.

tiff's product were well known before Defendants entered the marketplace with their "Roldan" products. (*See, e.g.*, Duval Dep. at 10–11, 28, 41–42; Francois Dep., taken Nov. 11, 1994, at 10–22, 55, 221–23; Rodriguez Dep., at 16–19; Perez Dep., at 32–34, 35; Jean Dep., taken Nov. 17, 1994, at 18–19; Morales Dep., taken Nov. 23, 1994, at 16–18, 20–21; Cabrera Dep., taken Dec. 2, 1994, at 6–7).

42. Since 1991, Plaintiff has sold approximately six (6) million units of its "Jabon Germicida Roldan" product, which is but one of two hundred (200) products that Plaintiff makes and sells under its own commercial name. (5/1/95 Hr'g Tr., Vol. 1, at 89–99).

43. As late as 1994, E. Klinger, on behalf of Tex, was buying and selling Plaintiff's "Jabon Germicida Roldan" product. (*See, e.g.*, Jean Dep. at 23–25, 65–67).

44. By 1988, J. Aini and R. Aini knew that Plaintiff manufactured "Jabon Germicida Roldan" in the Dominican Republic. (*See* ¶ 45 & n. 6 *infra*). J. Aini and R. Aini bought and sold Plaintiff's "Roldan" products in the United States, primarily to wholesalers and retailers in South Florida. (*E.g.*, Francois Dep. at 17–19, 73, 186–89, 222–23, 240–43; Rodriguez Dep. at 16–20; Duval Dep. at 36–37; 5/1/95 Hr'g Tr., Vol. 2, at 4–11, 13–18; *see also* Pl.Exs. 400–427). J. Aini and R. Aini had customers in the United States who recognized the "Roldan" name and Plaintiff's trade dress and associated "Roldan" products with Plaintiff. (R. Aini Dep. at 76–77, 80–82).

45. Between 1988 and 1989, the Ainis purchased approximately eighty (80) cases of Plaintiff's "Jabon Germicida Roldan" from a Dominican Republic wholesaler, Casa Dermaline. (Proffer Test. Ricardo Tomes Polan-co Reynoso, Pl.'s Written Proffer of Rebuttal Witness Test.Supp.Mot.Prelim.Inj., filed July 12, 1995, at 4–5).[6]

46. In response to customers' requests for "Jabon Germicida Roldan," in December of 1991, Defendant A.B.C.E., through its principals, R. Aini and J. Aini, attempted, by making direct solicitations to Plaintiff in the form of correspondence and telephone communications, to secure a distribution agreement for the territories of the United States, Canada, the Caribbean and Africa for Plaintiff's "Jabon Germicida Roldan" product. (*See* Pl.Exs. 207–211; J. Aini Dep. at 167–68, 171; R. Aini Dep. 86–87, 91–98, 101–07, 109–10, 112–22).

47. The Ainis were proposing to purchase approximately 1,600 cases of Plaintiff's "Jabon Germicida Roldan" soap per month.[7] (Pl.Ex. 208). The quantity being negotiated for supports Plaintiff's contention that the demand for its product in the United States and elsewhere was great.

48. The correspondence between R. Aini and Plaintiff which occurred over a two-week period in December, 1991, reveals that a distribution agreement could not be reached between Plaintiff and the Ainis because they could not agree on price. (Pl.Exs. 207–11).

49. J. Aini testified that he instructed R. Aini to stop the negotiations when he found out that Plaintiff's product contained mercury. (J. Aini Dep. at 218).

50. A review of the correspondence between Plaintiff and R. Aini reveals that the ingredients of Plaintiff's products were never mentioned. (*See* Pl.Exs. 207–211). In addition, R. Aini testified at deposition that she had not been provided a sample of the packaging for Plaintiff's "Jabon Germicida Rol-

---

6. According to J. Aini, in 1988 and 1989, A.B.C.E. imported "Roldan" products from Lagos, Nigeria, which were made in "Hindustan, India." (*See* J. Aini Dep. at 168, 176). It appears, however, that the product being imported was, in fact, Plaintiff's product, which was purchased indirectly from Casa Dermaline, a wholesaler in the Dominican Republic. J. Aini testified that he purchased a small quantity of this "Hindustan" Roldan soap, but due to the limited quantity, it was only sold in his retail store. (*Id.* at 174–75). J. Aini testified that as far as he knows, he was the only person in the United States who was selling these Roldan products from Hindustan, India. (*Id.* at 175). The record suggests, however, that all "Jabon Germicida Roldan" products which J. Aini distributed wholesale at that time was Plaintiff's product from the Dominican Republic. (*E.g.*, 5/1/95 Hearing Tr., Vol. 2, at 6–7). There is no record evidence as to J. Aini's retail "Jabon Germicida Roldan" product sales at that time.

7. Each case of soap contains 144 individual bars of soap.

dan" product, that she did not know what the ingredients were of the product, and that she did not recall that the ingredients of the product or that FDA compliance were issues in the negotiations. (R. Aini Dep. at 103–04, 109–11).

51. In the Spring of 1993, Defendant Horowitz and non-party Ivan Gabor agreed to form Tex, a wholesale business in cosmetics. (5/1/95 Hr'g Tr., Vol. 2, at 19–21). Mr. Gabor testified that he and Horowitz were 50–50 partners in Tex. (*Id.* at 20–21).

52. The product and price list that Tex used listed Plaintiff's "Jabon Germicida Roldan" product as a product that Tex sold. (*Id.* at 35–41; Pl.Ex. 3).

53. In late summer of 1993, Tex and Horowitz sought to obtain from Plaintiff an agreement to distribute Plaintiff's products, including its "Jabon Germicida Roldan" soap, and to represent Plaintiff for a "line extension," consisting of creams and lotions bearing the "Roldan" mark. (5/1/95 Hr'g Tr., Vol. 2, at 31–34).

54. Subsequently, however, Mr. Gabor terminated his relationship with Tex, and entered into an Agreement with Plaintiff on behalf of his own company, I.G. Enterprises, Inc., to be Plaintiff's distributor for the State of Florida. (*Id.* at 44–46).

55. Roldan Corporation ("Roldan") was formed by Defendants "to produce or to have produced for the corporation" "Roldan" products. (J. Aini Dep. at 106–107). Roldan is not licensed by Plaintiff to make or sell "Roldan" products, and the Defendants' "Roldan" products are not made with the authority or consent of Plaintiff, and are not made according to Plaintiff's quality control or supervision. (5/1/95 Hr'g Tr., Vol. 1, at 73, 104–109).

56. It is unclear from the record where Defendants' "Roldan" products are manufactured, or by whom.

57. Defendants' "Roldan" products are sold in the New York/New Jersey area by Zuri and Homeboy's, and in Florida and the Caribbean by Tex. (J. Aini Dep. at 141–48, 149–50).

58. In November, 1993, "Roldan Corporation" filed an application with the United States Patent and Trademark Office, signed by R. Aini as the vice president of "Roldan Corporation." [8] (R. Aini Dep.Ex. 10).

59. Some time in 1994, Defendants began to make and distribute their "Roldan" products, consisting of a soap, a cream, and a lotion. (Pl.Exs. 226–229). Defendants sold a "Jabon Germicida Roldan 2%" soap, in packaging that uses a trade dress that is nearly identical to the trade dress that Plaintiff has used since 1970 or 1971 for its "Jabon Germicida Roldan 2%" soap product. The packaging of this product states in Spanish and French that it is made "for Roldan" in "the European Economic Community." (Pl.Ex. 226).

60. Defendants also began to sell another product, named "Cream Germicida Roldan," which is a skin cream, which packaging uses the same trade dress, consisting of red and yellow lines, as does Plaintiff's "Jabon Germicida Roldan 2%" soap product. The packaging of Defendants' product states that it is "made in the EEC for Roldan Inc." (Pl.'s Ex. 227).[9]

61. Defendants also began to sell a third product, a skin lotion that is called "Lotion Germicida Roldan," packaged in a plastic bottle which states that it is a "perfumed dry skin lotion." (Pl.Ex. 229). The plastic bottle uses Plaintiff's "Jabon Germicida Roldan 2%" trade dress consisting of red and yellow lines. On its container, Defendants' "Lotion Germicida Roldan" states that it "has been carefully tested and approved in the United States and has been prepared in accordance with the demanding standards of Roldan

---

8. As discussed *supra* at ¶ 11, & n. 1, R. Aini did not recall signing this application. (R. Aini Dep. at 62–69, 72–73). Further, she maintained that she did not know anything about "Roldan Corporation" or its products and she stated that she had no basis for the statements contained in the declaration submitted to the United States Patent and Trademark Office in support of the applica-

tion by Roldan Corporation to register the "Germicida Roldan" mark. (*Id.* at 72).

9. The evidence in the record suggests that this product contains a prescription level amount of "hydroquinone". (Proffered Test. Raubicheck, Pl.'s Proffer Witness Test. Supp.Mot.Prelim.Inj., filed June 9, 1995, at 25).

Inc." At some point, the trade dress for this "Lotion Germicida Roldan" product was changed to read "Made in England for Roldan Corp. USA," instead of "Made in England for Roldan Inc. USA." (Pl.Ex. 228).

62. The evidence in the record suggests that while all three of Defendants' products contain the word "Germicida," which is Spanish for "germicidal," none of Defendants' products contain any germicidal ingredients. (Proffered Test. Dr. Stewart, Pl.'s Proffer Witness Test.Supp.Mot.Prelim.Inj., filed June 9, 1995, at 7–8. *See also* 5/1/95 Hr'g Tr., Vol. 1, at 120–21).

63. Defendants' products are not made by Plaintiff or any affiliate of Plaintiff; it is uncontroverted that "Roldan Inc.," "Roldan Corp. USA," nor "Roldan Inc. USA" do not exist. (J. Aini Dep. at 131–32).

64. The trade dress that Defendants have adopted for their soap, cream, and lotion is confusingly similar to the trade dress that Plaintiff has used for over twenty (20) years for its "Jabon Germicida Roldan 2%" product.

65. Through the use of this confusingly similar trade dress and the presence of the "Germicida Roldan" phrase on the packaging, Defendants' three products appear to originate from Plaintiff. The record has ample evidence that purchasers believe that Defendants' products are made by Plaintiff or someone affiliated or associated with Plaintiff, such as a subsidiary. (*See, e.g.,* Morales Dep. at 18–19, 41–45; Rodriguez Dep. at 24–30, 35–36, 40–41, 45–49, 51–52; Perez Dep. at 41–42, 54–56; Schechter Dep., taken Nov. 19, 1994, at 18; Jean Dep. at 81–82, 118–20).

66. In addition to imitating Plaintiff's trade dress, using the "Roldan" trademark, and misstating the nature of its products to the public, E. Klinger, acting on behalf of Tex, R. Aini and J. Aini have misrepresented to wholesalers and customers that they have acquired from Plaintiff the exclusive right to sell, distribute and manufacture Plaintiff's products in the United States, and/or have falsely represented that they have registered the "Roldan" name in the United States. (*E.g.,* Jean Dep. at 8–9, 12–13, 28–30, 35–37, 39–40, 56–57, 84–90, 103–04; 118–19; *see also*

Francois Dep. at 24–27, 31, 54–55, 100–101, 104–108, 244–45; Duval Dep. at 14–16, 41–42).

67. No Defendant has obtained a registration of the "Roldan" mark with the United States Patent and Trademark Office. No Defendant in this action had (or has) any manufacturing or distribution agreement with Plaintiff nor the right, pursuant to a licensing agreement with Plaintiff, to use the "Roldan" name or Plaintiff's distinctive trade dress in the United States. Nor has Plaintiff authorized or consented to Defendants' manufacture or sale of the products that Defendants are selling as "Roldan" products.

68. The record reflects that Defendants' products are not made according to Plaintiff's quality standards. (5/1/95 Hr'g Tr., Vol. 1, at 102–109).

69. Beginning in June, 1994, Plaintiff began to receive samples of Defendants' "Roldan" products from customers in the United States, Bahamas, Turks & Caicos Islands, and Haiti (*Id.* at 115–17).

70. Plaintiff also began to receive requests for creams and lotions. Customers from the Bahamas, Turks & Caicos, Haiti and the Dominican Republic began to ask why Plaintiff had not told them that it manufactured these products. (*Id.* at 117, 118–20).

71. Plaintiff has experienced the displacement of the market for its products by a market for counterfeit products and by the loss of control over its name and trade dress, both in the United States and abroad. Mr. Roldan estimated that Plaintiff's sales of its "Jabon Germicida Roldan" products have decreased approximately eighteen percent (18%) as a result of the counterfeiting. (*Id.* at 123).

72. The consumer complaints reflect the perception in the marketplace that Plaintiff has begun to make and sell "bad products." (Francois Dep. at 55–56, 130–131; *see also* Jean Dep. at 101–02; Duval Dep. at 39).

73. The value of Plaintiff's goodwill has been decreased and Plaintiff will continue to suffer this irreparable injury absent injunctive relief.

74. The evidence supports the finding that Defendants' conduct was done deliberately, knowingly, and maliciously to trade upon the goodwill and reputation of Plaintiff.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action. The Court has *in personam* jurisdiction over all Defendants. (*See* Order, dated May 1, 1995, denying motions of Homeboy's, A.B.C.E., R. Aini and J. Aini to Abate, Quash and/or Dismiss Am. Compl. for Lack of *in Personam* Juris.).

■ Plaintiff is entitled to a preliminary injunction if it shows: (1) a substantial likelihood of prevailing on the merits of its claim at trial; (2) a substantial threat of irreparable injury if injunctive relief is denied; (3) the injury to the plaintiff outweighs the harm an injunction may cause to the defendants; and (4) the injunction will serve the public interest. Fed.R.Civ.P. 65(b). *See Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989). *See also E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 n. 13 (11th Cir.1985); *BellSouth Advertising & Publishing Corp. v. Real Color Pages, Inc.*, 792 F.Supp. 775, 780 (M.D.Fla.1991); *Burger King Corp. v. Lee*, 766 F.Supp. 1149, 1154 (S.D.Fla.1991). "[N]o particular quantum of proof is required as to each of the four criteria." *Louis v. Meissner*, 530 F.Supp. 924, 925 (S.D.Fla.1981). Plaintiff has established each element required for a preliminary injunction, and is therefore entitled to a preliminary injunction.

## I. Plaintiff has a Substantial Likelihood of Prevailing on the Merits of its Claims at Trial

### A. Plaintiff Is Likely to Prevail on Count I: Lanham Act § 43(a), 15 U.S.C. § 1125(a)

■ The gist of an action under § 43(a), 15 U.S.C. § 1125(a), is the use of an identifying name or symbol (i) that is likely to cause confusion or to deceive purchasers as to the source or origin of a product (§ 1125(a)(1)(A)); or (ii) that misrepresents the "nature, characteristics, qualities, or geographic origin" of one's goods or products in commercial advertising or promotion (§ 1125(a)(1)(B)).[10] Section 43(a) provides trademark protection to those who have not registered their trademark in the United States, but who were the first to use the mark in the United States marketplace. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

■ Defendants argue that they, not Plaintiff, are entitled to use the "Roldan" trademark and trade dress in the United States because Defendants were the first user of the trademark and trade dress in the United States. "The cases are legion to the effect that for inherently distinctive marks, ownership is governed by priority of use." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.02(1)(a) at 16–4 & n. 5 (3d ed. 1995). The record demonstrates that Plaintiff was using its trademark and trade dress in the United States since 1988.[11] Defendants, on the other hand, began distributing their "Roldan"

---

**10.** Section 43(a) of the Lanham Act provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1988).

**11.** Plaintiff concedes that it did not make a version of its "Jabon Germicida Roldan" soap expressly for distribution in the United States until 1990.

products some time in 1993 or 1994. Plaintiff, therefore, has established first use of its trademark and trade dress in the United States.[12]

The test for liability under § 43(a)(1)(A) is likelihood of confusion for claims of trademark infringement, unfair competition and false designation of origin. *Two Pesos,* 505 U.S. at 775–76, 112 S.Ct. at 2761. The Supreme Court found, in a trade dress infringement case, that secondary meaning is not necessary for inherently distinctive trade dress protection under § 43(a). *Id.* at 763, 112 S.Ct. at 2753. Defendants concede, and the Court concurs, that Plaintiff's "Roldan" trademark and Plaintiff's trade dress for its "Jabon Germicida Roldan 2%" soap product are non-functional and inherently distinctive. (*See* Cross Mot.Roldan at 14–15). Therefore, the focus of the Court's inquiry as to whether Plaintiff is likely to succeed on the merits as to this count under the Lanham Act is whether there exists record evidence to demonstrate that there is a likelihood of confusion between Plaintiff and Defendants' "Roldan" products.[13]

In *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983), the Eleventh Circuit identified seven factors relevant to whether a likelihood of confusion exists between two marks (which also applies to likelihood of confusion between trade dress): the type of mark, the similarity of design, the similarity of the product, the identity of retail outlets and purchasers, the similarity of advertising media used, defendant's intent, and actual confusion. *See also AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1545 (11th Cir.1986) (affirming district court's finding of trade dress infringement), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500, 504 (5th Cir.1980); *Rolex Watch U.S.A., Inc. v. Canner,* 645 F.Supp. 484, 488 (S.D.Fla.1986). The Court need not, however, find that all seven factors exist before it can grant preliminary injunctive relief. *Rolex Watch,* 645 F.Supp. at 495. Furthermore, "[t]he likelihood of confusion is not limited to confusion at the initial point of sale; it can be at any point in the chain of distribution or owner-

12. Defendants incorrectly argue that Plaintiff is precluded from establishing first use of the "Roldan" trademark in the United States because Plaintiff itself did not export the Roldan products to the United States. (*See* Defs.' Mem.Opp'n to Pl.'s Mot.Prelim.Inj., filed Feb. 2, 1995, at 18–19, 23; Defs.' Supplement Mem.Opp'n to Pl.'s Mot.Prelim.Inj., filed Mar. 9, 1995). Defendants cite *In re: Application of Silenus Wines, Inc.,* 557 F.2d 806, 807, 194 U.S.P.Q. 261, 262 (C.C.P.A. 1977) as authority for the proposition that the "use in commerce" must be accomplished by the party desiring the trademark protection. However, "a mark shall be deemed to be in use in commerce—(1) on all goods when (A) it is placed in any manner on the goods or their containers ... or on the tags or labels affixed thereto, ... and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127 (1976). Furthermore, "[o]wnership of a mark accrues when goods bearing the mark are placed on the market." *Wallace & Co. v. Repetti, Inc.,* 266 F. 307 (2d Cir.), *cert. denied,* 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451 (1920). Who actually distributes the product to the end user is irrelevant; what is relevant is who was the actor that placed the product with the mark into commerce. McCarthy, *supra,* § 16.02(1)(b) at 16–6. Since Plaintiff placed the mark on the product at the point of production, and was the first to distribute the product into the stream of commerce, and since

the product with the mark was distributed into the United States marketplace, it is irrelevant that Plaintiff did not, itself, send the product into the United States.

13. Plaintiff also argues that its "Roldan" mark has acquired a secondary meaning. In *Two Pesos,* the Supreme Court defines the test to determine whether a mark has a secondary meaning: "'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. at 2756 n. 4 (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). Although there is evidence in the record which suggests that the "Roldan" mark is associated with Laboratorios Roldan, C. por A. in the Dominican Republic, the evidence does not necessarily establish that the "primary significance" of the mark identifies the source as opposed to the product. Therefore, based on the record developed to date, the Court cannot find that Plaintiff is substantially likely to prevail on Count I based on the "Roldan" mark's secondary meaning. However, since Plaintiff need not establish that the mark has acquired a secondary meaning to prevail on Count I, this finding does not preclude Plaintiff from the injunctive remedy it seeks.

ship, including post-sale confusion of third parties who later encounter the product." *Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc.,* 730 F.Supp. 1387, 1394 (S.D.Tex.1989) (*citing Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir. 1986)); *Rolex Watch U.S.A. v. Forrester,* 2 U.S.P.Q.2d 1292, 1295, 1986 WL 15668 (S.D.Fla.1986).

Plaintiff has demonstrated that the public is likely to be deceived and/or confused, and in fact, has been deceived and confused, as to the origin and manufacturer of Defendants' "Roldan" products.

Both Plaintiff's "Roldan" trademark and Plaintiff's trade dress for its "Jabon Germicida Roldan" product are distinctive, "fanciful" and "arbitrary." The evidence demonstrates that the "Roldan" name and Plaintiff's distinctive trade dress for its "Jabon Germicida Roldan" product were famous, well-known and recognized well before Defendants entered the market with their "Roldan" products. The evidence also demonstrates that Plaintiff's mark and trade dress have traditionally signified a single source of origin, namely, Laboratorios Roldan in the Dominican Republic. Defendants' use of the "Roldan" name and Plaintiff's trade dress creates the impression that Defendants' "Roldan" products are being made by Plaintiff, or are being made with the approval and authorization of Laboratorios Roldan in the Dominican Republic. (*See, e.g.,* Morales Dep. at 18–19, 41–45; Rodriguez Dep. at 24–30, 35–36, 40–41, 45–49, 51–52; Perez Dep. at 41–42, 54–56; Schechter Dep. at 18; Jean Dep. at 81–82, 118–20).

This Court concludes that the Defendants' "Roldan" mark and trade dress are almost identical to Plaintiff's. The record reflects that purchasers of Defendants' products failed to perceive any differences between Defendants' trademark and trade dress and Plaintiff's trademark and trade dress. (*See, e.g.,* Morales Dep. at 18, 41–43; Rodriguez Dep. at 28, 41, 48–49; Perez Dep. at 54–55; Schechter Dep. at 18; Jean Dep. at 82). This factor is "of great significance" in determining likelihood of confusion. *Rolex Watch,* 645 F.Supp. at 488–89.

Defendants' soap, cream and lotion "Roldan" products and Plaintiff's soap Roldan products are of the same type. It has been held that "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon,* 628 F.2d at 505; *John H. Harland,* 711 F.2d at 976.

Furthermore, to the extent that it is undisputed that Defendants were familiar with Plaintiff's product and with the popularity of Plaintiff's product among particular ethnic groups, Defendants' production and sale of their soap, cream and lotion under the "Roldan" name and with Plaintiff's trade dress strongly supports the inference that Defendants intended to "trade on the reputation of the plaintiff's business" in violation of § 43(a). *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1515 n. 9 (11th Cir.1984); *John H. Harland,* 711 F.2d at 977; *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703–4 (5th Cir.1981); *AmBrit,* 812 F.2d at 1542; *BellSouth,* 792 F.Supp. at 783.

The record reflects evidence of actual confusion among purchasers as to the origin of Defendants' products. Plaintiff has received inquiries about Defendants' skin creams and skin lotions, and complaints about Defendants' products have been directed to Plaintiff. Some of Defendants' customers believe that the "Roldan" products that they have been purchasing from Defendants were either manufactured by Plaintiff in Santo Domingo, or by a company associated or affiliated with Plaintiff, or pursuant to an agreement with Plaintiff. (*See, e.g.,* Morales Dep. at 18–19, 41–45; Rodriguez Dep. at 24–30, 35–36, 40–41, 45–49, 51–52; Perez Dep. at 41–42, 54–56; Schechter Dep. at 18; Jean Dep. at 81–82, 118–20). Actual confusion is "the best evidence of likelihood of confusion." *John H. Harland,* 711 F.2d at 978.

■ Section 43(a)(1)(B) protects trademark and trade dress first users from others who, in commercial advertising or promotion, make false or misleading statements about "the nature, characteristics, qualities, and geographic origin" of their products. Neither Plaintiff nor Defendants have engaged in advertising for the "Roldan" products.

Defendants, however, are liable under § 43(a)(1)(B) of the Lanham Act because they have promoted their products to certain of their consumers by stating that they had an exclusive manufacturing and distribution agreement with Plaintiff to distribute Plaintiff's products in the United States. (*E.g.*, Jean Dep. at 8–9, 12–13, 28–30, 35–37, 39–40, 56–57, 84–90, 103–04; 118–19; Francois Dep. at 24–27, 31, 54–55, 100–101, 104–108, 244–45; Duval Dep. at 14–16, 41–42).[14] This misrepresentation of quality and/or origin constitutes a violation of § 43(a)(1)(B) under which Plaintiff is substantially likely to prevail.

The Court therefore concludes that Plaintiff has a substantial likelihood of prevailing on the merits as to Count I.

### B. Plaintiff Is Likely to Prevail on Count II: Lanham Act § 44(h) and the Paris Convention

■ Section 44 of the Lanham Act provides protection for trademarks, trade names and against unfair competition in the United States to parties that own a trademark and/or trade name registered in a country that is a signatory to the Paris Convention. 15 U.S.C. § 1126 (1988).[15] *See, e.g., Davidoff Extension S.A. v. Davidoff Int'l, Inc.*, 221 U.S.P.Q. 465, 1983 WL 203 (S.D.Fla.1983) (preliminary injunction granted); *Davidoff Extension S.A. v. Davidoff Int'l, Inc*, 612 F.Supp. 4, 9 (S.D.Fla.1984), *aff'd*, 774 F.2d 1178 (11th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986)

(permanent injunction entered). Both the United States and the Dominican Republic are parties to the Paris Convention for the Protection of Industrial Property of March 20, 1883, 21 U.S.T. 1583, as amended on September 28, 1979 (the "Paris Convention").

It is uncontroverted that Plaintiff is a corporation formed and existing under the laws of the Dominican Republic, and as such is a national of that country. Furthermore, Plaintiff has registered both the trademark "Roldan" and the trade name "Laboratorios Roldan, C. por A." in the Dominican Republic.

■ Accordingly, under § 44(h) of the Lanham Act and Article 10 bis of the Paris Convention, Plaintiff "is protected from unfair competition."[16] The record supports Plaintiff's allegations that Defendants deliberately used Plaintiff's "Roldan" trademark and distinctive trade dress and made other misrepresentations to Plaintiff's established customers and to Defendants' newly acquired customers. This type of behavior constitutes unfair competition which article 10 bis of the Paris Convention exists to protect against. *See, e.g., Davidoff*, 612 F.Supp. at 8–9. The record establishes that Defendants' conduct has created confusion with Plaintiff's goods, has involved misrepresentations about both Plaintiff and Defendants' goods, and has served to discredit Plaintiff's reputation and the value of Plaintiff's goods.

**14.** Plaintiff suggests broadly reading Section 43(a)(1)(B) to prohibit the alleged misrepresentations contained on Defendants' labelling. In support of this reading, Plaintiff cites to *Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 74 (S.D.N.Y.1988) and *Warren Corp. v. Goldwert Textile Sales, Inc.*, 581 F.Supp. 897, 900 (S.D.N.Y.1984). The Court declines to adopt this reading of the section.

**15.** This section of the Lanham Act serves to implement the Paris Convention; it does not delineate substantive rights. *Davidoff Extension S.A. v. Davidoff Int'l, Inc.*, 612 F.Supp. 4, 8 (S.D.Fla. 1984); 15 U.S.C. § 1126.

**16.** Article 10 bis of the Paris Convention provides in full:
(1) The countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition.

(2) Any act of competition contrary to honest practices in industrial or commercial matters constitutes an act of unfair competition.
(3) The following in particular shall be prohibited:
  1. all acts of such a nature as to create confusion by any means whatever with the establishment, the goods, or the industrial or commercial activities, of a competitor;
  2. false allegations in the course of a trade of such a nature as to discredit the establishment, the goods, or the industrial or commercial activities of a competitor;
  3. indications or allegations the use of which in the course of trade is liable to mislead the public as to the nature, the manufacturing process, the characteristics, the suitability for their purpose, or the quantity, of the goods.
Paris Convention, art. 10 bis, 21 U.S.T. 1583.

■ Plaintiff is also entitled to protection under Article 6 bis of the Paris Convention.[17] Plaintiff has registered its "Roldan" trademark in the Dominican Republic. Furthermore, the record substantiates Plaintiff's assertion that its trade dress is well known and identified with Plaintiff. The trade dress and mark which Defendants are using is almost identical to Plaintiff's trade dress and mark and the product markets substantially overlap. The Court concludes that Defendants' use of a trademark and trade dress which are almost identical to Plaintiff's is liable to cause confusion between Plaintiff's and Defendants' goods. Plaintiff is, therefore, likely to prevail under Article 6 bis of the Paris Convention as well.

Accordingly, the Court concludes that Plaintiff is substantially likely to prevail on the merits of Count II pursuant to Defendants' alleged violations of Articles 6 bis and 10 bis of the Paris Convention and Section 44(h) of the Lanham Act.

### C. Plaintiff is Likely to Prevail on Counts III, IV and V: Florida State Law Claims

■ Plaintiff brings three claims under Florida law. In Count III, Plaintiff alleges that Defendants' conduct violates Florida's Statutory Trademark Dilution and Injury to Business Reputation Statute.[18] This statute explicitly provides for a court's imposition of injunctive relief upon a showing that there exists a likelihood (1) of injury to a plaintiff's business reputation or (2) of dilution of the distinctive quality of the mark. Fla.Stat. ch. 495.151. This Court recently held that "[t]here is no doubt that the commercial value of the plaintiff's trade name and service mark is likely to be diluted by defendant's unauthorized use of a virtually identical trade name and service mark, and that this will create a likelihood of injury to plaintiff's business reputation." *American United Life Ins. Co. v. American United Ins. Co.,* 731 F.Supp. 480, 487 (S.D.Fla.1990) (citing *Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1186 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985)).

Plaintiff's "Roldan" trademark is distinctive. Defendants' "Roldan" mark is almost identical to Plaintiff's. The record reflects that purchasers of Defendants' products are likely to—and in fact, do—associate Defendants' products with those of Plaintiff. There is evidence in the record of actual injury to Plaintiff's business reputation due to Defendants' products; Plaintiff has received complaints about Defendants' "Roldan" products.[19] Plaintiff, therefore, has established that it is likely to prevail on the merits as to Count III.

■ In Count IV, Plaintiff alleges that Defendants' conduct violates Florida's Deceptive and Unfair Practices Act.[20] There is

---

**17.** Article 6 bis provides in pertinent part:

(1) The countries of the Union undertake ... to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.

Paris Convention, art. 6 bis, 21 U.S.T. 1583.

**18.** Florida Statute § 495.151 provides:

Every person, association, or union of workingmen adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and all courts having jurisdiction thereof shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Fla.Stat. ch. 495.151 (1995).

**19.** Also, by generating a high volume of products bearing Plaintiff's mark, Defendants lessen the uniqueness of the Plaintiff's mark, thereby undermining its strength. *See Chassis Master Corp. v. Borrego,* 610 F.Supp. 473, 479 (S.D.Fla.1985).

**20.** Florida Statute 501.204 provides in pertinent part:

(1) Unfair methods of competition, unconscionable acts or practices in the conduct of any

substantial evidence in the record suggesting that Defendants are intentionally palming or passing off their products as those of Plaintiff or someone associated or affiliated with Plaintiff. The Court finds that this is the type of behavior which the statute was meant to protect against. *See Contemporary Restaurant Concepts, Ltd. v. Las Tapas–Jacksonville, Inc.*, 753 F.Supp. 1560, 1565 (M.D.Fla.1991) ("[v]iolations of this statute include the notion of 'palming off'") (citing *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F.Supp. 75, 84 (S.D.Fla.1981)). Therefore, Plaintiff has a substantial likelihood of prevailing on the merits as to Count IV.

In Count V, Plaintiff claims that Defendants' conduct constitutes common law trademark infringement and unfair competition. In order to prevail under this Count, Plaintiff must establish the following:

(1) The plaintiff first adopted and used a certain name (or mark or symbol or logo or design) in a certain market or trade area, as a means of establishing good will and reputation and to describe, identify or denominate particular services offered by it (or goods made or sold by it) and to distinguish them from similar services rendered or offered (or similar goods marketed) by others, and

(2) through its association with such services or goods the plaintiff's tradename (or mark, etc.) has acquired a special significance as the name of the services rendered (or goods marketed) by the plaintiff in its trade area because plaintiff's tradename (or mark, etc.)

(a) is inherently distinctive (fanciful, novel or arbitrary), or

(b) while generic, descriptive, or geographic, plaintiff's tradename (or mark,

etc.) has, by actual usage, acquired in a certain trade area, a secondary, special or trade meaning as indicating, describing, identifying or denominating the plaintiff as the source of certain services (or goods), and

(3) the defendant has commenced, or intends to commence, the use of an identical or confusingly similar tradename (or mark, etc.) to indicate or identify similar services rendered (or similar goods marketed) by it in competition with plaintiff in the same trade areas in which the plaintiff has already established its tradename (or mark, etc.) and

(4) as a consequence of the defendant's action, or threatened action, customer confusion of source or as to the sponsorship of the services (or goods) offered, or [sic] be offered, by the defendant is probable (likely) or inevitable.

*Tally–Ho*, 889 F.2d at 1026 (quoting *American Bank v. First Am. Bank & Trust*, 455 So.2d 443, 445–46 (Fla.App. 5 Dist.1984)).[21] Plaintiff's likelihood of success on its claim of common law unfair competition and trade make infringement is apparent from the discussion on Plaintiff's likelihood of success on its claims under Lanham Act §§ 43(a) and 44(h). *See Chassis Master Corp. v. Borrego*, 610 F.Supp. 473, 479 (S.D.Fla.1985).

As with its Federal claims, the Court concludes that Plaintiff is likely to succeed on the merits of each of these State law claims.[22]

## II. There is a Substantial Likelihood of Irreparable Injury to Plaintiff if it is not Awarded Injunctive Relief

Likelihood of confusion constitutes irreparable injury. *Burger King*, 766

---

trade or commerce are hereby declared unlawful.

Fla.Stat. ch. 501.204(1) (1995).

**21.** The requirements for an unfair competition claim based on a trademark infringement claim, and a trademark infringement claim are almost identical. *Tally–Ho*, 889 F.2d at 1026 n. 14; *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). To the extent that the requirements are distinguishable, the Eleventh Circuit has noted that the unfair

competition claim is the broader of the two claims. *Freedom Sav. & Loan*, 757 F.2d at 1186. Therefore, since the Court finds that the evidence in the record establishes that Plaintiff is likely to prevail on the merits of the trademark infringement claim, the Court finds that it is necessarily the case that Plaintiff is likely to prevail on the merits of the unfair competition claim.

**22.** The remaining claim, Count VI, is for unjust enrichment and equitable accounting. It is therefore unnecessary to apply the preliminary injunction analysis to this Count.

F.Supp. at 1157 (S.D.Fla.1991). *See also BellSouth,* 792 F.Supp. at 784 ("The law is well settled that the existence of a likelihood of confusion constitutes irreparable injury, as a matter of law, sufficient to satisfy the requirements of Federal Rule of Civil Procedure 65."). In this case, the record demonstrates that not only is it likely that Defendants' "Roldan" products will cause confusion, Defendants' "Roldan" products have caused actual confusion. Evidence in the record demonstrates that Defendants' products, which are being perceived as Plaintiff's products, have generated a number of complaints which are being directed at Plaintiff. Therefore, the actual confusion between Plaintiff's and Defendants' products is causing a decline in public perception of Plaintiff's product quality. Furthermore, even if the quality of Defendants' products is not inferior to that of Plaintiff's products, it has been held that a plaintiff suffers irreparable injury due to the loss of control over products bearing its trademark or trade dress. *Joy Mfg.,* 730 F.Supp. at 1394 ("The injury lies in the fact that the plaintiff can no longer control its own reputation and goodwill."). The Court finds that Plaintiff is presently suffering from irreparable injury. Plaintiff has therefore satisfied this element of the preliminary injunction analysis.

### III. The Injury to Plaintiff Outweighs the Harm an Injunction may Cause to Defendants

The Court finds that Defendants have no legitimate interest in the continued use of its "Roldan" mark and its red and yellow striped trade dress in light of the evidence which suggests that Plaintiff's Roldan products were being actively marketed in the United States (at certain times by the Defendants themselves) prior to the Defendants' adoption of the similar mark and trade dress. Defendants' assertion that they conducted a thorough patent search is of no moment when Plaintiff's product, with the trademark, trade name and trade dress was already in use in the United States. Plaintiff has offered evidence into the record which suggests that Defendants' "Roldan" products, which are being confused with Plaintiff's Roldan products, are of an inferior quality. Furthermore, there is evidence in the record that these inferior products are being attributed to Plaintiff. Every day that Defendants' "Roldan" products stay in the marketplace causes Plaintiff irreparable harm. Therefore, the balance of the equities in this case weighs heavily in favor of granting Plaintiff injunctive relief.

### IV. A Preliminary Injunction Serves the Public Interest

The public is entitled to be free from deception and confusion. "In a trademark infringement or unfair competition case, a third party, the consuming public, is present and its interests are paramount." *BellSouth,* 792 F.Supp. at 785. Injunctive relief will serve the public interest by immediately stopping Defendants' deception of consumers. *Id. see also Teledyne Indus., Inc. v. Windmere Prods., Inc.,* 433 F.Supp. 710, 740 (S.D.Fla.1977) ("customer confusion is by its very nature against the public interest"). The Court finds that imposition of a preliminary injunction in this case will have no countervailing harm to the public. Therefore, Plaintiff has satisfied the final element for preliminary injunctive relief.

### CONCLUSION

For the reasons stated above, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction be, and the same is hereby, GRANTED.

Accordingly, for the duration of the pendency of this action, each Defendant named herein, and each of Defendants' agents, employees, attorneys, successors, assigns, affiliates, joint venturers, and any person(s) in active concert or participation with any of them, and/or any person(s) acting for, with, by, through or under any of them be enjoined and restrained:

(1) from manufacturing, importing, selling, offering for sale, distributing, advertising or promoting any goods which bear any Laboratorios Roldan trademark, trade or commercial name, and/or trade dress, alone or in combination with any other words or symbols, including but not limited to the "Roldan" trademark;

(2) from using any words or symbols which so resemble any Laboratorios Rol-

**1572**

dan trademark, trade or commercial name, and/or trade dress as to be likely to cause confusion, mistake or deception, on or in connection with the manufacture, importation, sale, offering for sale, distribution, advertisement or promotion of any product which is not authorized by or for Laboratorios Roldan;

(3) from using any word, term, name, symbol, device, or combination thereof which causes or is likely to cause confusion, deception, or mistake as to the affiliation of Defendants (or any one of them) or their goods with Laboratorios Roldan or the goods and products made by Laboratorios Roldan, or as to the origin of Defendants' goods, or any false designation of origin, false or misleading description or representation of fact;

(4) from further diluting or infringing the rights of Laboratorios Roldan in and to any Laboratorios Roldan trademark, trade or commercial names, and/or trade dress, including but not limited to the "Roldan" trademark, or otherwise damaging Laboratorios Roldan's goodwill or business reputation;

(5) from otherwise competing unfairly with Laboratorios Roldan in any manner;

(6) from continuing to perform in any manner whatsoever any of the acts and activities complained of in the Second Amended Complaint; and

(7) from taking any action that may defeat, or may have the effect of defeating, Laboratorios Roldan's ability to recover and recoup its damages and attorney's fees from Defendants, including but not limited to prohibiting Defendants from transferring any moneys from their current bank accounts to other accounts in order to secret assets, and prohibiting Defendants from disposing of any assets in order to reduce the ability to satisfy any eventual monetary award, until such time as any judgment for damages against Defendants has been satisfied.

DONE AND ORDERED.