**MONSANTO COMPANY and The NutraSweet Company, Plaintiffs,**

v.

**Fausto CAMPUZANO et al., Defendants.**

No. 99–2082–Civ.

United States District Court, S.D. Florida, Miami Division.

May 2, 2002.

Keith Mack, Miami, FL, for Monsanto Co.

Rodney A. Brown, Brown & Fox, New York City, for Merisant Co.

Jeremy Adam Koss, Rothstein Rosenfeld & Pancier, Hollywood, FL, Carlos Ramiro Caso, Miami, FL, for Fausto J. Campuzano.

Jeremy Adam Koss, Rothstein Rosenfeld & Pancier, Hollywood, FL, for Maria Campuzano, F. Garcia Wholesale & Export, Inc.

Steven Fine, Fort Lauderdale, FL, for Mark Siegel, Kathleen M. Siegel, Trio Intern. Trading, Inc.

Michael B. Chesal, Kluger Peretz Kaplan & Berlin, Miami, FL, Ricardo Alberto Reyes, Tobin & Reyes, Boca Raton, FL, for Countywide of Miami, Inc.

Steven Herbert Hibbe, Miami, FL, for Jose I. Arguelles, Sylvia B. Arguelles, Trapeza Overseas, Inc., Intrasit Services, Inc.

Francis Xavier Santana, Miami, FL, for Carlos Casanova.

Carlos Ramiro Caso, Miami, FL, for Alvaro Buendia.

C. Vincent LoCurto, Fort Lauderdale, FL, for Sun Container, Inc.

### ORDER GRANTING SUMMARY JUDGMENT IN PART AGAINST DEFENDANTS TRIO INTERNATIONAL TRADING, INC. AND MARK SIEGEL

JORDAN, District Judge.

Merisant, as successor in interest to the Monsanto Company and The Nutrasweet Company, seeks a permanent injunction restraining the defendants' sale and distribution of Equal tabletop sweetener as well as monetary relief for alleged trademark

and copyright infringement, false designation of origin, false description and dilution, and alleged unjust enrichment, and Florida law claims of unfair competition injury to business reputation, dilution of the distinctive quality of its trademark and participation in unconscionable, unfair, and deceptive acts or practices. Merisant moves for summary judgment against defendant Trio International and Mark Siegel (the Trio defendants) on liability and damages under all counts and seeks the entry of a judgment in the amount of $7,741,294.20, which equals three times the alleged damages, together with costs, prejudgment interest of attorneys' fees, and investigative costs on Counts 1 through 3. Additionally, Merisant seeks statutory damages in the amount of $150,000, together with attorneys' fees on Count 4, and the entry of a permanent injunction on all counts enjoining the Trio defendants from infringing Merisant's trademark, trade dress and copyrights. Federal jurisdiction exists pursuant to 15 U.S.C. § 1121(a), 17 U.S.C. § 101 et seq. and 28 U.S.C. §§ 1331, 1338 and 1367. For the reasons which follow, Merisant's motion [D.E.183] is GRANTED in part and DENIED in part as to liability. Appropriate relief will be determined following a separate evidentiary hearing.

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact

is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential elements of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1228 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light favorable to the Trio defendants, there is evidence on which the trier of fact could reasonably find a verdict in their favor. *See Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn*, 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

### II. UNDISPUTED RELEVANT FACTS[1]

Monsanto is a manufacturer and distributor of consumer products sold under various registered trademarks owned by its wholly owned subsidiary, The NutraSweet Company. These products include the Equal brand of tabletop sweetener, which is a well-known and widely sold sweetener. Monsanto's successor Merisant, was substituted as the plaintiff in place of Monsanto and NutraSweet on January 16, 2001 [D.E.223].

Merisant owns the following trademarks for "Equal":

Registration No. 1,158,683, registered on June 30, 1981

Registration No. 1,318,800, registered on February 12, 1985

---

1. Under Local Rule 7.5, all material facts set forth in the statement served by the moving party are deemed admitted unless controverted by the opposing party's statement. Unless otherwise noted, these facts include those set forth in Merisant's statement of material facts, which are undisputed or purposes of this summary judgment motion to the extent that they have not been controverted by the Trio defendants. Some facts not discussed here are analyzed in the discussion of Merisant's claims.

Registration No. 2,012,219, registered on October 29, 1996

Merisant, through Nutrasweet, also owns the following trademarks for "Nutrasweet":

Registration No. 1,262,746, registered on January 3, 1984

Registration No. 1,358,678 registered on September 10, 1985

Registration No. 1,336,188 registered on May 21, 1985

Merisant, through Nutrasweet, also owns the "NutraSweet Symbols":

Registration No. 1,325,241, registered March 19, 1985

Registration No. 1,366,139, registered on October 22, 1985.

Substantial resources have been devoted to the advertising and promotion of Equal, with more than $150,000,000.00 being spent in advertising and promoting Equal since 1992. As a result, the Equal product bearing the NutraSweet trademarks and trade dress, is well known to the purchasing public throughout the United States. Sweeteners bearing the Equal and Nutra-Sweet trademarks and the Equal trade dress have been and are now recognized by the public and in the food industry as originating from a single source. Net sales of Equal since 1992 have been in excess of $1,000,000,000.00, and the Equal and NutraSweet trademarks, the Equal trade dress, and the goodwill associated with them are of inestimable value to Monsanto, NutraSweet, and Merisant. Monsanto and NutraSweet have engaged in and Merisant continues to engage in, interstate activities designed to promote the Equal product and the business and goodwill associated with their trademarks and to expand the use and reputation of their trademarks, trade dress, logos and property in Florida and throughout the United States.

The packaging Monsanto uses for the Equal product it sells to the retail market varies from the packaging uses for the food service/institutional market. The bulk quantity cartons used for the institutional market contain either 1000 or 2000 packets, while the retail boxes contain 50, 100, 200, 500, or 700 packets. The food service packaging also expressly states "not for retail sale" and each individual packet is marked "We Proudly Serve" on the front of the packet, and "FOR RESTAURANT USE" or the back of the packet.

In equal retail boxes are marked with a strawberry design made up of photographs, text and graphics. The design is wholly original material that is copyrightable subject matter under the United States copyright laws. The certificates of registration Monsanto obtained from the Register of Copyrights for its strawberry design are dated April 13, 1999. The Equal retail boxes at issue may also contain other wholly original copyrightable material—specifically, a coffee cup design made up of photographs, text and graphics. Monsanto also obtained certificates of registration for the coffee cup design, dated March 29, 1999. Both the coffee cup design and the strawberry design, therefore, are protected designs, for which Monsanto (now Merisant) owns the right, title and interest, as well as the copyright.

As a result of quality assurance audits in the fall of 1998, Monsanto learned that Equal food service packets were being sold in counterfeit retail packaging. Without Monsanto's authorization, individual packets of Equal sweetener that were originally sold in bulk food service cartons for institutional use only were re-packaged in counterfeit blue retail boxes imprinted with the protected designs.

The counterfeit Equal boxes expressly misrepresented that the product was dis-

tributed by the NutraSweet Company and that the boxes were printed in the United States of America. The counterfeit Equal product can be identified as follows:

- The colors of the counterfeit retail boxes are washed out, while the genuine retail boxes have crisp colors.

- The counterfeit blue retail packaging contains Equal packets bearing the words "We proudly serve" on the front of the packet and "FOR RESTAURANT USE" on the back of the packets. These phrases are not on the packets contained in genuine retail boxes.

- There are coupons printed on the inside of the genuine 50, 100 (and 200) count retail boxes bearing the strawberry design. There are no coupons on the inside of the counterfeit retail boxes.

- The corrugated shipping cartons used to ship the counterfeit retail boxes can also be distinguished from the shipping cartons used for the genuine product. A circular seal with the name of the manufacturer of the shipping carton, either "Wabash" or "International Paper," is present on a genuine shipping carton, whereas on a counterfeit carton, either there is no seal, or if there is a seal, it does not contain the name of the manufacturer.

Mark Siegel and his wife Kathleen Siegel are the shareholders owners of Trio, as well as the only officers and directors of Trio since April of 1996. Mr. and Mrs. Siegel are the only employees of Trio (other than their daughters who have performed administrative functions). Mr. Siegel's home serves as the Trio business location.

Mr. Siegel first met defendant Alvaro Buendia some time around 1993 or 1994. *See* Deposition of Mark Siegel at 19 [D.E. 168] Mr. Siegel, through Trio, purchased approximately $500,000 of Hunt, Wesson products and Platoid film from Mr. Buendia's company, Idexcol. *See id.* at 21, 24. In 1997 Mr. Buendia informed Mr. Siegel that he had access to Equal product at the Miami port with sun and water-damaged exterior cases, and asked Mr. Siegel to find someone to manufacture replacement exterior cases. *See id.* at 28. Mr. Siegel, in furtherance of the opportunity to purchase the Equal product and resell it, contacted Sun Container to see if it was able to duplicate the exterior cases. *See id.* at 32. Mr. Siegel testified that he purchased a case of Equal from a Publix Supermarket, took out the Equal product, and brought Sun Container the empty case to use as a sample so that it could duplicate the case. *See id.* at 34. Mr. Siegel informed Mr. Buendia that he had found a company to reproduce the cases and then introduced Mr. Buendia to Sun Container. *See id.* at 35. Sun Container proceeded to duplicate the cases. *See id.* at 36. Sun Container billed, and was later paid, by Trio for the exterior Equal cases it made. *See id.* at 44. The reproduced cases were then shipped to defendant Trapeza's warehouse in Miami, where they were used to repack the boxes of Equal product. *See id.* Mr. Siegel never went to the port to look at the damaged cases of Equal, but did go to Trapeza's warehouse where the Equal packets were repacked. *See id.* He did not see any damaged cases at the warehouse, but saw the packaging of Equal products. *See id.* Nevertheless, Mr. Siegel continued to participate in the repackaging process, as explained below.

According to Mr. Siegel, about three or four months after he told Mr. Buendia that he had found a company to reproduce the cases, Mr. Buendia informed him that he was a Monsanto representative, and outlined a plan to take packets of Equal product purchased institutionally and repack-

age it into retail cartons. *See id.* at 36 Mr. Siegel was told by Mr. Buendia that they could make more money that way. *See id.* It was at that point that Mr. Siegel came to the conclusion that the supposedly damaged cases never existed. *See id.* at 37, 38.

Mr. Siegel testified that he compared an equal carton he purchased from Publix and found it to be identical with a carton that Mr. Buendia had previously shown him that was purportedly manufactured by Monsanto in Columbia. *See id.* at 41. Mr. Buendia also showed Mr. Siegel his Monsanto business card and a letter to Mr. Buendia written in Spanish on what appeared to be Monsanto letterhead. *See id.* at 41, 42. Mr. Siegel did not keep a copy of either the letter or the business card, and he testified that he could not read the letter because he did not understand Spanish. *See id.* Mr. Siegel was asked by Mr. Buendia to send samples of the Equal carton to Colombia, which he did. *See id.* at 44 Sun Container billed, and was later paid, by Trio for the exterior Equal cases it made. *See id.* In late 1997, Mr. Buendia introduced Mr. Siegel to Fausto Campuzano, known as Campy, as a potential source for purchasing the institutional Equal product. *See id.* at 45. Mr. Campuzano is the sole shareholder and President of F. Garcia Wholesale and Export. *See* Answers to Plaintiffs Interrogatories at ¶¶ 1–3, Exh. A [D.E. 173].

Mr. Siegel, through Trio, was to coordinate everything domestically, sell the product, obtain the product from Mr. Campuzano, send it over to Trapeza, get the boxes and the cases over to Trapeza, collect the lands, and pay the bills. *See id.* at 49. In late 1997 and/or early 1998 Mr. Siegel began purchasing institutional Equal product from F. Garcia Wholesale and Export. F. Garcia sold 52,520 cases of Equal product to the Trio defendants.

Mr. Siegel arranged to have defendant Countywide of Miami. Inc. pick up the Equal product from its storage location and transport it to Trapeza. At Trapeza it was repackaged from institutional food service cartons into retail boxes. Those retail boxes were then packed into shipping cartons.

Trio made all payments to Trapeza. The Trio defendants sold the re-packaged Equal product to Victory Wholesale Grocers. Purity Wholesale Grocers. Quality King Distributors and Comimsa. Total sales to these companies amounted to $2,580,431.40.

## III. Discussion

### A. Trademark Infringement

Merisant argues that the Trio defendants' participation in the unauthorized counterfeiting and distribution of the Equal product infringed its trademarks, causing substantial and irreparable damage by misleading and confusing consumers as to the origin and source of the product, and diluting the trademark, distinctive quality. Merisant further argues that the distribution and sale of the Equal product in counterfeit packaging will cause damage to the invaluable reputation and goodwill that has been established for the NutraSweet and Equal trademarks. Additionally, Merisant claims that it will be unable to comply with its legal obligations [2]

---

**2.** The legal obligations cited by Merisant include 21 C.F.R. Part 110 (including specifically, sub-parts A, B, C, E, and G). entitled "Current Good Manufacturing Practice in Manufacturing, Packing or Holding Human Food"; 21 C.F.R. Part 7, sub-part C. § 7.40 et seq. entitled "Recalls (Including Product Corrections)—Guidelines on Policy, Procedures, and Industry Responsibilities"; §§ 701 and 704 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 371 and 374; and § 361 of the Public Health Service Act 42 U.S.C.

regarding the packaging, repackaging, sealing and resealing of food products.

The response from the Trio defendants does not contain a statement in opposition to the statements undisputed facts submitted by Merisant as part of its summary judgment motion. The response does, however, alleged that there are material issues of fact to be determined by the trier of fact and included the following matters "testified to" by Mr. Siegel:

a. Alvero Buendia arranged for the printing of the outside blue boxes;

b. Alvero Buendia advised Trio and Siegel that the printer of the boxes was an authorized printer for Monsanto.

c. Trio and Mark Siegel reasonably believed that the printer of the blue boxes was authorized, since the company which did the repackaging was a bona fide company, openly operating in Miami, Florida, and Mr. Buendia was able to obtain the product for resale from a former Hunt, Wesson representative (Mr. Campuzano) directly from Monsanto;

d. when Mr. Siegel went to the stores to purchase Equal, he was able to find identical boxes of Equal, with the same or similar non-tampered packets in the boxes, as he had purchased from Mr. Campuzano. The packets inspected had the same or similar restriction of "for restaurant use only" or "not for resale" or other similar restrictive resale language; and

e. Alvaro Buendia received a fee of 50% of the net profits of the transactions with the Equal product.

*See* Response to Motion for Summary Judgment against Trio International and Mark Siegel at 2 [D.E. 194]. The Trio

defendants also argue that the plaintiffs should have assumed that the packets sold to Mr. Campuzano would be resold to consumers of Equal. They further argue that there were no problems caused by the repackaging of Equal that is, that there were no complaints from consumers as to the sufficiency, quality of value of the product.

Unfortunately for the Trio defendants, the asserted issues of fact in dispute are simply not materialed. Specifically, it is undisputed that the Trio defendants participated in the manufacture and distribution of the counterfeit Equal and Nutra-Sweet product cases and cartons, and Merisant argues that this contact constitutes a violation of 15 U.S.C. § 1114(1)(a). Mr. Siegel has not submitted anything that purports to be authorization from Monsanto, NutraSweet, or Merisant that granted him or Trio permission to use or recreate the Equal trademark.

■ A defendant is liable for infringement of a federally-registered trademark under § 32(1) of the Lanham Act. 15 U.S.C. § 1114(1), if, without the trademark owner's consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which is likely to "cause confusion, or to cause mistake, or to deceive." *See John H. Harland Co. v. Clarke Checks. Inc.*, 711 F.2d 966, 972 (11th Cir.1983). Merisant, therefore, must show (1) that its mark had priority; and (2) that the Trio defendants' use of the mark was likely to cause consumer confusion. *See* 15 U.S.C. § 1114(1): *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir.1997) (citing *Dieter v. B & H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 326 (11th Cir.1989)). It is undisputed

§ 264. *See* Plaintiffs' Motion for Summary Judgment Against Trio defendants at 14–15

[D.E. 183].

that Merisant's mark had priority—indeed, it is undisputed that Merisant, as successor to Monsanto, owns the registered trademarks for Equal and NutraSweet and never authorized their duplication. As to the second prong, I presume that the counterfeit items caused public confusion in the marketplace, as the counterfeit marks and the genuine marks are substantially identical both in design and use and it is undisputed that the counterfeit marks were sold to the public. *See id.* (citing *Polo Fashions v. Craftex, Inc.* 816 F.2d 145, 148 (4th Cir.1987) (a presumption of public confusion arises when counterfeit symbols are substantially identical to genuine symbols and are used in the same manner as the genuine symbols are used)).

■ The Eleventh Circuit and the former Fifth Circuit have identified various factors to be considered in determining whether a likelihood of confusion exists between two trademarks. These include "the type of trademark, the similarity of design, the similarity of the product, the identity of retail outlet and purchasers, the similarity of advertising media used, the defendants' intent, and actual confusion." *See John H. Harland Co.,* 711 F.2d at 972 (quoting *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500, 504 (5th Cir. 1980)). There is no need of analyze each of these factors in every case however, because consideration of fewer than all seven factors can support a finding of likelihood a confusion. *See Univ. of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1543 (11th Cir.1985) ("We never have held that a court must specifically mention each of the seven factors in order to avoid reversal on appeal.") But even a cursory examination of these factors leads to the inescapable conclusion that there is a likelihood of confusion, or a likelihood of causing mistake or deception, particularly in light of the former Fifth Circuit's holding that if "a

plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *See John H. Harland Co.,* 711 F.2d at 976 (quoting *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d at 506).

It is apparent from this record that in repackaging the Equal product, the Trio defendants did, in fact, intend to derive "benefit from the reputation" of the plaintiffs. Mr. Siegel testified that after realizing that there were no damaged containers of Equal at the port, he was enticed by Mr. Buendia into getting involved in the repackaging of institutional Equal product because he would "make more money that way." *See* Deposition of Mark Siegel at 36.

■ Moreover, while the infringer's intent is one of the factors to be considered in analyzing whether there is a likelihood of confusion, in the Eleventh Circuit the type of mark and evidence of actual confusion are the most important factors. *See Dieter,* 880 F.2d at 326. Moreover, the greater the similarity between products and services, the greater the likelihood of confusion. *See Exxon Corp.,* 628 F.2d at 505. Consequently, Mr. Siegel's contention that he was not aware that his behavior constituted infringing activity is not enough to create an issue of material fact on the matter of likelihood of confusion.

Likewise, Mr. Siegel's assertion that he relied on the assurances of Mr. Buendia does not change the fact that his activity constituted trademark infringement. Mr. Siegel testified that he could not read Spanish and therefore did not know the contents of the purported letter on Monsanto letterhead that allegedly authorized Mr. Buendia as a Monsanto representative. Mr. Siegel, moreover, did not retain

a copy of that letter. Nor did Mr. Siegel retain a copy of a business card that Mr. Buendia purportedly showed him bearing the Monsanto name. Mr. Siegel, in. other words, has not produced any evidence— other than his unsupported a legations— that he had any reason to believe the reproduction of the Equal trademarks was authorized. *See Levi Strauss & Co. v. Diaz,* 778 F.Supp. 1206, 1207–08 (S.D.Fla. 1991) (holding that the innocent infringer defense fails where defendant was remiss in failing to make appropriate inquiry concerning the legitimacy of the goods).

■ Even so, taking the evidence in the light most favorable to Mr. Siegel and Trio, the innocent infringer defense, if valid, does not affect the issue of liability for trademark infringement, only that of Merisant's available remedies. *See Playboy Enterprises v. Frena,* 839 F.Supp. 1552, 1560 (M.D.Fla.1993) ("Even though a guilty state of mind is relevant evidence of trademark infringement, an innocent state of mind is irrelevant on the issue of likelihood of confusion since the lack of intent to deceive does nothing to alleviate the confusion precipitated by similarity of trademarks."). Accordingly, an analysis of Mr. Siegel's good faith or innocence is unnecessary at this time as a separate evidentiary hearing will be held on all remedies. *See Levi Strauss,* 778 F.Supp. at 1207 (pursuant to 15 U.S.C. § 1117(b), plaintiff is entitled to an award of treble damages and attorneys' fees, unless defendant can prove extenuating circumstances, such as lack of knowledge or intent to mitigate the damages).

■ The Trio defendants also argue that the plaintiffs have unclean hands— that is, that they should have assumed the packets that were sold to Mr. Campuzano would be resold to consumers of Equal. In the Eleventh Circuit, a defendant attempting to invoke the unclean hands de-

fense must satisfy two requirements. *Calloway v. Partners Nat. Health Plans,* 986 F.2d 446, 450 (11th Cir.1993). First, the defendant must demonstrate that the plaintiffs' wrongdoing is directly related to the claim against which it is asserted. *Id.* at 451 (citations omitted). Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by the plaintiffs' conduct. In this case, there has been no showing whatsoever that the plaintiffs engaged in any wrongdoing. Merely selling their product to a distributor does not and should not open any door for a defendant to assert an unclean hands defense.

■ The Trio defendants also assert that there were no problems caused by the repackaging of Equal—that is, that there were no complaints from consumers as to the sufficiency, quality or value of the product. This assertion has nothing to do with an unclean hands defense, but in any case, it is a conclusory and self serving declaration without any support. A manufacturer of a product has every right to control the distribution of that product, be able to recall the product if necessary, and assure the buying public that it is the true source of the product. *See Laboratorios Roldan, C. por A. v. Tex International, Inc.,* 902 F.Supp. 1555, 1570 (S.D.Fla.1995) ("Likelihood of confusion constitutes irreparable injury.") *See also Joy Mfg. Co. v. CGM Valve & Gauge Co., Inc.,* 730 F.Supp. 1387, 1394 (S.D.Tex.1989) ("The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill."). Thus, this purported "defense" is not persuasive.

■ Trademark infringement is a species of tort, and any member of the distribution chain is liable as a joint tort-feasor. *See Dive N' Surf, Inc. v. Anselowitz,* 834

F.Supp. 379, 382 (M.D.Fla.1993) (citations omitted). There are no genuine issues of material facts in dispute, and Merisant has established each element of the claim for trademark infringement. Accordingly, summary judgment against the Trio defendants as to Count I is granted.

### B. VIOLATIONS OF 15 U.S.C. § 1125—FALSE DESIGNATION OF ORIGIN FALSE DESCRIPTION, AND DILUTION

In pertinent part, 15 U.S.C. § 1125(a)(1), which Merisant alleges was violated in Counts II and III, provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities.

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. *Id.*

■ The Eleventh Circuit has held that a defendant is liable for a violation of § 1125 if the plaintiff can show that (1) its mark is inherently distinctive or has acquired secondary meaning, (2) its mark is primarily non-functional, and (3) the defen-

dant's mark is confusingly similar. *See AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986). If there is a connection in the consumer's mind between the mark and the product's producer—that is, there is a "secondary meaning," whether that producer is known or unknown protectability is established notwithstanding the indistinctiveness of the trade dress. *See id.* at 1536.

■ First, Merisant has established that its mark has acquired secondary meaning, for it is undisputed that Equal and NutraSweet have devoted substantial resources to the advertising and promotion of Equal, and that as a consequence, the NutraSweet trademarks and trade dress are well known to the purchasing public throughout the United States. Also undisputed is the fact that sweeteners bearing the Equal and NutraSweet trademarks and the Equal trade dress have been and are now recognized by the public and in the food industry as originating from a single source. *See Remcraft Lighting Products, Inc. v. Maxim Lighting, Inc.,* 706 F.Supp. 855, 858 (S.D.Fla.1989) (citing *Isaly Company v. Kraft, Inc.,* 619 F.Supp. 983, 990 (M.D.Fla.1985) (holding that the trier of fact must consider the length of time and manner fuse of trade dress the nature and extent of its use, and efforts made in order to promote a conscious connection in the public's mind between the mark and the particular source of origin)). *See also Brooks Shoe Manufacturing Company, Inc. v. Suave Shoe Corp.,* 716 F.2d 854, 860 (11th Cir.1983) (evidence of intentional copying is also probative of secondary meaning). I therefore conclude that Merisant has established the first element of its § 1125 claim.

■ Second, "a mark is 'functional' if it affords benefits in the manufacturing, marketing, or use of the goods or services

with which [it] is used, apart from any benefits attributable to the mark's significance as an indication of source, that are important to effective competition by others and that are not practically available through the use of alternative designs." *University of Florida v. KPB, Inc.*, 89 F.3d 773, 777 n. 6 (11th Cir.1996) (citing Restatement (Third) of Unfair Competition § 17 (1994)). When applying the functionality test, the product is viewed as a whole and not as to any one specific part, *see Remcraft Lighting Products, Inc.*, 706 F.Supp. at 857, so even if individual elements of a product's packaging are functional, the package as a whole can still be afforded protection. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986). I find that the second element is satisfied here. Though the Equal box itself may be functional, there is nothing functional about the strawberry or coffee cup designs on the Equal boxes, the fact that the boxes are blue, or the combination of graphics and words used to create the Equal and NutraSweet trade dress. The number of alternative designs practically available to Monsanto were undoubtedly infinite.

 The central inquiry in the claims under § 1125 is "whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers." *See Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 191 (5th Cir.1981) (quoting *Boston Professional Hockey Association v. Dallas Cap & Emblem Mfg. Inc.*, 510 F.2d 1004, 1010 (5th Cir.1975)). "The touchstone under § 1125 is not similarity of the registered mark but similarity in the overall trade dress of the products." *See id.* (citations omitted). *See also Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,

684 F.2d 821, 831–32 (11th Cir.1982) (holding that the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's is the touchstone test for a violation of § 1125). Trade dress involves the "total image of a product and may include features such as size, shape, color or color combination texture, graphics or even particular sales techniques." *See University of Florida v. KPB, Inc.*, 89 F.3d 773, 776 n. 4 (11th Cir.1996) (citations omitted). The factors to be examined in analyzing such a claim are essentially the same as the factors considered for determination of trademark infringement, "but the scope of inquiry into similarity of design is considerably broader." *See Sun–Fun Products Inc.*, 656 F.2d at 191. *See also John H. Harland Co.*, 711 F.2d at 981 ("The factors relevant to determining whether there is a likelihood of confusion between the trade dress of the two products, are 'essentially the same' as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks."). The undisputed facts characterize the overall trade dress of the counterfeit Equal product packaging to be nearly identical to the genuine Equal product. The boxes are labeled with the trademarked Equal and NutraSweet names. The colors of the counterfeit retail boxes are washed out, while the genuine retail boxes have crisp colors, but they are both blue. The protected designs were reproduced on the counterfeit boxes. Furthermore, the counterfeit boxes expressly misrepresent that the product is distributed by the Nutra-Sweet Company and that the boxes were printed in the United States of America. Other than some printed coupons which are printed on the inside of the genuine retail boxes, but not present on the counterfeit retail boxes, and the phrases "for restaurant use" and "we proudly serve" appearing on the packets in the counterfeit

retail boxes but not in the genuine retail boxes, the genuine and counterfeit boxes are substantially similar if not identical, making confusion, mistake, or deception of the public likely as to the affiliation, connection or association with the manufacturers of the Equal product and the product's origin. Accordingly, summary judgment against the Trio defendants on Counts II and III is granted.

## C. THE COPYRIGHT INFRINGEMENT CLAIM IN COUNT IV

■ To prevail on its copyright infringement claim, Merisant must prove (1) ownership of a valid copyright in the work allegedly infringed and (2) that the Trio defendants copied the protected work. *See Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir.1986). The first element is satisfied in that the registration certificates obtained by Monsanto for the strawberry and coffee cup designs constitute *prima facie* evidence of valid copyright ownership of each design. 17 U.S.C. § 410(c). *See Dive N' Surf, Inc.,* 834 F.Supp. at 382. In order to satisfy the second element, Merisant must show that the Trio defendants participated in the copyright infringement, but it does not have to prove that the Trio defendants personally duplicated the designs. *See Dive N' Surf, Inc.,* 834 F.Supp. at 382 citing *Screen Gems–Columbia Music, Inc. v. Metlis and Lebow Corp.,* 453 F.2d 552, 554 (2d Cir.1972) ("copyright infringement is in the nature of a tort, for which all who participate in the infringement are jointly and severally liable").

Mr. Siegel testified that he found Sun Container in order to reproduce the outer cartons of Equal product, purchased a box of Equal at the Publix Supermarket and sent it to Mr. Buendia as a sample to assist with the duplication of the box in

Colombia, paid for the packets of institutional Equal product and coordinated everything domestically, including selling the product, obtaining the product from Mr. Campuzano, sending it over to Trapeza, getting the boxes and the cases over to Trapeza, collecting the funds, and paying the bills. Mr. Siegel arranged to have Countywide of Miami, Inc. pick up the Equal product from its storage location and transport it to Trapeza, where it was repackaged from institutional food service cartons into retail boxes, and then packed into shipping cartons. Trio made all payments to Trapeza. The Trio defendants sold the re-packaged Equal product to Victory Wholesale Grocers, Purity Wholesale Grocers, Quality King Distributors and Comimsa.

Accordingly, there are no disputed issues of material fact concerning the Trio defendants' participation in the infringing of Merisant's copyright, and both elements of Merisant's copyright infringement claim have been established. Thus, summary judgment is appropriate against the Trio defendants on the copyright infringement claim in Count IV.

## D. UNJUST ENRICHMENT CLAIM—COUNT VI

■ It is unclear from Merisant's complaint whether its claim for unjust enrichment is under federal or state law. While the memorandum of law accompanying Merisant's motion for summary judgment addresses the standard for unjust enrichment under Florida law, because the complaint does not specifically plead Florida law. I will consider the claim under federal law. Under federal law, "a deliberate or willful trademark infringer can be required to turn over the profits he earns during the period of infringement subject to the discretion of the district judge and in light of the equities of the case." 15 U.S.C. § 1117. *See American Farm Bureau Federation v. Alabama Farmers Federa-*

*tion,* 935 F.Supp. 1533, 1551 (M.D.Ala. 1996) (citing *Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582, (5th Cir. 1980)). Under the Lanham Act, "willfulness" does not require a finding that the defendant intended to steal the plaintiffs' trademark, or produce a counterfeit product, but only that the infringement was not accidental, or was done knowingly and with disregard of the rights of the mark holder. *See Ambrit Inc. v. Kraft Inc.,* 6 U.S.P.Q.2D 1235, 1236, 1988 WL 281566 (M.D.Fla.1988) (citations omitted).

Mr. Siegel testified at his deposition that he was under the impression that Mr. Buendia was an authorized Monsanto representative and that Monsanto was arranging for the printing of boxes in Colombia. But as noted previously, Mr. Siegel has not produced anything in the record to support these assertions, and has conceded that he was involved with all the infringing activity. In order for an infringer to be required to account for profits, he must only be shown to have acted deliberately or purposefully for "[w]hether he believed himself to be within the law or not, he was knowingly and deliberately cashing in upon the good will of [the registrant.]" *Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir.1988). Significantly, Mr. Siegel has admitted that he no longer believed there were damaged exterior cartons in need of replacement at the port when he continued to participate in the plan to repackage the Equal product, and conceded that he planned "to make more money that way."

■ The law in the Eleventh Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under 15 U.S.C. § 1117. *See Burger King Corp.,* 855 F.2d at 780. Accounting for such profits furthers the congressional purpose by making infringement unprofitable, and be- cause it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future, it is justified. *See id.* (citing *Maltina Corp. v. Cawy Bottling Co., Inc.* 613 F.2d 582, 585 (5th Cir. 1980)).

■ Thus, given this analysis of the trademark infringement claims. I conclude that Merisant has made the requisite showing for a claim of unjust enrichment under the Lanham Act. Summary judgment in favor of Merisant's granted on Count VI, and there is no reason to analyze whether Merisant has a state law claim for unjust enrichment.

### E. FLORIDA LAW CLAIMS

#### 1. COUNT V—UNFAIR COMPETITION UNDER FLORIDA COMMON LAW

■ "The Florida Trademark Act ... explicitly preserves common law rights in marks acquired in good faith." *Tally-Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1023 (11th Cir.) (citations omitted). The legal standard for federal trademark and unfair competition, and for common law trademark infringement, are essentially the same. *See id.* at 1025–26 and n. 14. To prevail on its unfair competition claims under Florida common law. Merisant must show " 'deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.' " *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493–94 (11th Cir. 1990) (quoting *Evans,* 785 F.2d at 914). In light of my analysis of Merisant's federal claims, I conclude that Merisant has established the elements necessary to its common law unfair competition claim. In other words, because it is undisputed that Merisant did not authorize the reproduction of its trademark and trade dress and because I have already found that there is a likelihood of consumer confusion, sum-

mary judgment is appropriate on the Florida common law claim of unfair competition in Count V.

### 2. COUNT VII—INJURY TO BUSINESS REPUTATION AND DILUTION OF TRADEMARK UNDER FLORIDA LAW

Count VII alleges that the defendants have caused injury to Merisant's business reputation and/or alternatively, caused dilution of the distinctive quality of Merisant's trademarks in violation Fla.Stat. § 495.151. Florida's anti-dilution statute. That statute allows a court to enjoin subsequent use of the same or similar trademark if the plaintiff proves

> that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark ... notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Fla.Stat. § 495.151

▮▮▮▮ Under Florida's statute, neither confusion nor competition are necessary. *See Harley–Davidson Motor Company v. Iron Eagle of Central Florida, Inc.*, 973 F.Supp. 1421, 1425 (M.D.Fla. 1997). But while it may be obvious that the distribution of a counterfeit product could easily result in dilution of the distinctive quality of Merisant's trademark and threaten its integrity, Florida's antidilution statue is "not intended to apply to the use of a similar mark on similar goods." *id.* The Eleventh Circuit, in *Community Federal Savings and Loan Assoc. v. Orondorff*, 678 F.2d 1034 (11th Cir.1982), noting that the dilution doctrine was not incorporated into the Lanham Act, quoted the Fifth Circuit's description of dilution:

> Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product to dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark.

678 F.2d at 1037 (quoting *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 450 (5th Cir.1973)). Accordingly, "dilution has no application when the question is whether the marks being used on goods of substantially the same descriptive properties are similar enough to cause confusion in the minds of consumers with respect to the source of the goods." *Community Federal Savings*, 678 F.2d at 1037 (quoting *Pro-Phy-Lac-Tic Brush Co. v. Jordan Marsh Co.*, 165 F.2d 549, 553 (1st Cir.1948)). In this case, Merisant is not arguing that its mark is being used on a dissimilar product, but rather, that its mark is being copied on boxes containing its genuine product by unauthorized individuals, thereby creating confusion in the minds of consumers. Thus, dilution is inapplicable and Merisant's motion for summary judgment as to Count VII is DENIED.

### 3. COUNT VIII—UNFAIR TRADE PRACTICE UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

▮▮▮ In Count VIII, Merisant alleges that, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.204, the Trio defendants participated in unconscionable acts or practices and participated in unfair or deceptive acts and practices by knowingly manufacturing, selling, and distributing the counterfeit Equal product. A private right of action for damages under the Act, however, cannot be maintained unless the alleged unfair or deceptive acts or practices complained of involved a consumer transaction. *See Bryant Heating and Air Conditioning*

*Corp., Inc. v. Carrier Corporation,* 597 F.Supp. 1045, 1053 (S.D.Fla.1984). In *Bryant,* the court noted that the Florida courts strictly construe the definition of consumer transaction in accord with the statute's definition as follows:

> a sale, lease, assignment, award by chance, or other disposition of an item of goods, a consumer service, or an intangible to an individual for purposes that are primarily personal, family, or household or that relate to a business opportunity that requires both his expenditure of money or property and his personal services on a continuing basis *and in which he has not been previously engaged* or a solicitation by a supplier with respect to any of these dispositions.

(emphasis added).

▮▮▮▮▮ In other words, "a cause of action for civil damages under Chapter 501 is legally insufficient in the absence of a showing that the plaintiff has not previously been engaged in the business involved." *See Big Tomato v. Tasty Concepts, Inc.* 972 F.Supp. 662, 663 (S.D.Fla.1997) (quoting *Darrell Swanson Consolidated Services v. Davis,* 433 So.2d 651, 652 (Fla. 1st DCA 1983)). This is presumably because the "statute appears to be directed to entities that have traditionally been thought of as consumers, in situations traditionally thought of as consumer transactions." *See Bryant Heating and Air Conditioning Corp., Inc.,* 597 F.Supp. at 1053 (quoting *Packaging Corporation International v. Travenol Laboratories,* 566 F.Supp. 1480, 1481 (S.D.Fla.1983)). Even assuming that Merisant could, in some cases, be considered a consumer, it can not fulfill the standing requirement under the Act that it not have engaged previously in the business involved. To the contrary, it is undisputed (and necessary to several of Merisant's other claims) that Merisant has and is engaged in the business involved, that is,

the manufacture, sale and distribution of the Equal product. The injury alleged, therefore, can not be characterized as arising out of a consumer transaction. Thus, I conclude that Merisant lacks standing to pursue its claim under the Florida Deceptive and Unfair Trade Practices Act. Merisant's motion for summary judgment is denied as to Count VIII, and summary judgment is granted in favor of the Trio defendants. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 n. 21 (11th Cir.1990) ("The Florida DTPA applies to consumer transactions, defined in part as transactions in which the consumer 'has not been previously engaged.' "). *See also Shibata, M.D., v. Lim,* 133 F.Supp.2d 1311, 1317–18 (M.D.Fla. 2000); *Big Tomato v. Tasty Concepts, Inc.* 972 F.Supp. at 663. *But see Laboratorios Roldan v. Tex Int'l Inc.,* 902 F.Supp. at 1570 (holding that "palming off" could constitute violation of Fla.Stat § 501.201).

## IV. CONCLUSION

In sum, Merisant's motion for summary judgment against the Trio defendants [D.E. 183] is GRANTED as to Counts I, II, III, IV, V, and VI, and DENIED as to Counts VII and VIII. Summary judgment is GRANTED in favor of the Trio defendants on Count VIII. A separate evidentiary hearing will be set for a determination of appropriate relief, including injunctive relief and damages. A final judgment will issue by separate order at a later time.